You may begin whenever you're ready. Thank you, Your Honor. May it please the Court, Chris Sconell for Appellant Amador County. Our appeal presents two discreet issues, each of which represent an independent basis for overturning the record of decision in this case. The first issue is whether the department properly grandfathered in the 2006 I.O.D.O. land's opinion, finding that the I.O.D. band is a restored tribe within the Weekend Big Run, while at the same time having acknowledged by adopting regulations that that was contrary to congressional intent in enacting the agreement. The second issue is the proper interpretation of the IRA and whether the I.O.D. band was a recognized tribe now under federal jurisdiction, now having been interpreted to mean in 1934. Starting with the grandfathering issue, generally speaking, it's black-letter law that agencies have an obligation to follow congressional intent in enforcing statutes, and so in adopting the 2008 regulations, the Secretary said, you know, there are very limited ways in which a tribe can become a restored tribe for purposes of that statute, and there's no dispute that the I.O.D. band doesn't meet any of those criteria. So the only way that they can be a restored tribe, as the I.O.D. defines, is the contrary Indian land's determination from a few years ago and a provision in the regulations that says, well, we're just going to grandfather that in. And quite frankly, there's no basis for that. The only basis for grandfathering in prior contrary acts is the framework set forth by the D.C. Circuit originally in the Retail, Wholesale, and Departments of Reunion case, which has been applied by that court a number of times, the NRDC case, the Sierra Club case, and which has also been adopted by this court as part of its circuit precedents, Garfield's Rodriguez, and a number of the other cases that we cited. And those... Doesn't that test usually apply when a new rule is adopted through adjudication, though, and this was actually a regulation? It does, mostly. But if you go back and look at the NRDC case and the Sierra Club case, those were regulations specifically. So it applies in both contexts. I recognize that the majority of cases where it comes up and where it tends to be applied, is the adjudicatory context, but it's certainly not limited to that and has been applied in the regulatory context. As I said, those provide the limited basis for an agency to grandfather in agency action that is admittedly contrary to Congressional intent. Again, there's no real dispute about what Congress's intent was here. And applying it in this circumstance, the criteria that are at issue, the federal government makes no real effort to even argue that they can meet those criteria, that there is a longstanding practice, that there's a demonstrated actionable reliance, that there's a strong degree of burden, that retroactive application would apply to the band, or that there's no statutory interest in applying Congressional intent. They just say, well, it doesn't apply, and that's it. The band makes some effort, but I think as we've explained in our briefs, the effort to show that there's a longstanding practice is really thin. It's premised on a couple of examples that came after the regulations were essentially adopted, and one where the agency refused to find that the band was over star drive. And that's not the extent of their examples for this longstanding practice. The simple fact is that there really wasn't a longstanding practice. It was just sort of an ad hoc thing, and then finally the secretary adopted regulations and said, you know, we know what Congress meant here, but this tribe we're going to let them squeak through anyway without any real basis for allowing that. Just the history, which counseled the previous argument, went into a little bit. Does that matter? I mean, you have a tribe that's been trying to get recognized for a very long time, and things keep changing to the deprivative injury, or for whatever reason it doesn't happen. Does that figure into the question of whether there's, for lack of a better term, an equitable basis for grandfathering them here? Well, I don't think it does in this particular case, and the reason is the reliance. The ROD says the reason for this grandfathering clause is that there may be reliance on the restored lands decision from 2006. Everything that came before, which counsel was talking about, came before, so there wasn't any reliance for any of that stuff. But in its context, I mean, you wouldn't have the 2006 decision if you didn't have all that other history. It's hard to untangle them, isn't it? Well, I understand that, but up until the 2006 decision, there was no reason for them to assume or to rely on a conclusion. They could take advantage of that restored lands exception. And I want to make a distinction. The discussion before was about whether they were federally recognized within the meaning of Part 83. This is about whether they are a restored tribe under AGRA. So it's a bit of a different analysis and a bit of a different question. So whether or not they were recognized in 1972 or 1994 doesn't really bear directly on whether. The grandfathering clause is, I think, what Judge Fogle is focusing on and which seems to be equitable in nature, which is quite different from the question under the Reorganization Act of what the definition is of these terms. But I think the concern is that it appears that the point of the whole thing is to look at the equities of the whole situation in determining whether to grandfather a tribe. Well, I think, respectfully, Your Honor, if the Iowne Band didn't have that piece of paper from 2006 and they had gone through this whole history and been recognized in 1972 or 1994, there's no question whatsoever that they couldn't take advantage of the restored tribes exception. So all of that past equitable history isn't really relevant to this inquiry. The only thing they have to stand on is the fact that they got a piece of paper in 2006 that is admittedly contrary to what now the Secretary has concluded is Congress intent in enacting AGRA. I think that's, I mean, I think, I mean, I see where you're going, but it seems to me that ignores reality. I mean, people, human beings are making decisions based on things that happened to other human beings. And so it's hard to say that none of that context mattered. Well, I take your point, Your Honor, but my point is that the, really, when you focus on it, the question boils down to is it equitable that they have this piece of paper makes all the difference? And the fact is that their whole history is irrelevant to that issue. It's just the fact that they managed to slide in before the 2008 regulations took effect and get this Indian lands determination that was, frankly, challenged from day one. So the idea that they were somehow relying on this lands determination to make all these, you know, investment decisions or whatever they were doing, there was always a cloud hanging over it. The county of Amador was in court within a couple of months after it being issued, and it was always clear that it played to challenge it again as soon as there was a final agency action. But the regulation itself has this grandfathering clause. So it's not like the agency, I mean, you're saying the agency decided what Congress meant, but they did both at once. They decided we're going to start making this more regularized going forward, but they apparently didn't think Congress required them to do it going backward. They were saying everything we've done up until now we're going to say is okay, but from now on we're getting our act together. I mean, what's wrong with that and what's wrong with that interpretation of what Congress wanted them to do? Well, I don't think there's any basis in the IRA for that sort of interpretation. I mean, they're not saying Congress meant for us to limit restoration to these three things going forward and intended for us to allow these other people. They're saying Congress intended to have this included universe, but we're going to make an exception on our own, not based on statutory language, just based on our own view of what's appropriate. So are you arguing that the regulation is invalid or that it has been improperly applied to these facts or both? Well, I mean, I'm not sure. I took the argument to be the second one, and what you're saying now seems to me, well, they had no authority to adopt this grandfathering regulation, but I didn't understand your briefing to make that argument. Am I wrong? Well, I mean, I suppose there might be circumstances in which the agency have required some sort of showing of actual compliance in some sort of a different factual scenario where it might be applicable, but simply based on the factual scenario here and the lack of any required showing whatsoever, I don't think there's any basis for it. We're talking past each other because I guess I'm trying to understand if you're saying that the regulation is void or invalid on its face as distinct from saying it isn't meant to apply here. Well, truthfully, I think it's both. Did you make that argument in your brief that it was a void regulation? Well, I think we did. I think we argued that the agency was required to take all of these factors into account in allowing for any sort of grandfathering for pending agency action. I was confused about this in your brief, though, because it seemed to me, I took you to be saying that this grandfathering is invalid because there isn't enough reliance, but then to only be talking about this tribe's reliance, and it seems to me that that was like apples and oranges sort of because the agency, when it adopted this regulation, that regulation will apply to all tribes. So whether this particular tribe had a lot of reliance, there could be lots of other tribes, and I don't think we have in our record, but presumably the agency decided we've had this practice for a long time. There are a lot of tribes that have had reliance, and this is how we're going to balance the equities. Well, I think there's two points. I think, first of all, I do want to say I agree that in this particular case, based on these facts, there is no reliance. But it kind of doesn't matter. Once the regulation is valid and there's grandfathering, then I don't know that they need to show particular reliance. Well, and I think the regulation is effective for not requiring the showing of reliance in the first place. In other words, the regulation doesn't conform to the requirements for when grandfathering is appropriate. It doesn't incorporate the standards that have been adopted for deciding when grandfathering can be enacted and when. But I'm not sure we know that. Maybe there are 100 other tribes that had tons of reliance, and that's exactly why we have this grandfathering clause. But that's, the regulation should have required that they make that showing. In other words, it should have required a case by, the standard under all of these cases is that there be a showing of real, actual reliance. In other words, the agency... But where, I mean, so you said earlier in response to my question that some cases involve a regulation. But do you have a case that says you can only have a time, a start date for a regulation, and a past practice going backwards where the agency in the regulation requires reliance? I mean, I've never seen a case say that that's a rule of administrative law. Well, I don't think I can think of any case that's that specific. But the cases have said that when a statute, when a regulation is adopted that does grandfathering, it's only appropriate, and this is the NRDC case and the Sierra Club case, those regulations that allow for grandfathering are only appropriate when they meet the tests that are set out in those cases. Recall that in the NRDC case and the Sierra Club case, the D.C. Circuit actually invalidated agency regulations that permitted grandfathering because they did not meet the standards that we're talking about here. So for the agency then to adopt a regulation permitting grandfathering without regard to those standards is improper. If they want to adopt a grandfathering regulation, they need to do one that conforms to the case law that sets forth the requirements for grandfathering. And that means that they need to require that an individual tribe come in and make a specific concrete showing of actual reliance. They can't just pursue it. They can't just say, well, some tribe somewhere might have relied, and so we're going to allow all of these people to do it. That's inconsistent with the cases that we cited, and that's not what the regulation does. And so I think it is invalid for that very reason. I think that the regulations adopted are inconsistent with the legal standard for when they could allow that sort of grandfathering. Before you run out of time completely, on the question of the meaning of this murky phrase in the Indian Reorganization Act, why should we depart from the interpretation that the Department of Interior has and that the District of Columbia courts have used? Well, I think we all answered two parts. One, I don't think there's any basis at all for deference, Chevron deference, and I think we've explained in our briefs why that's the case. The agency's interpretation is found in some informal adjudications and one solicitor's opinion. And under the case law of this court and the Supreme Court, those are not the cases. Right, it may be a lesser form of deference, but we aren't supposed to ignore it completely. Well, and so that comes to my second point, which is the interpretations that they're adopting just aren't plausible. And so that, by definition, means that D.C. courts are also not plausible, right? Well, no, because the D.C. Circuit opinion reached its conclusion by giving Chevron deference to the agency's interpretation, which would be improper under this court's case law. Well, but, you know, it still couldn't have done that without first concluding that the statute is ambiguous and that the interpretation offered is one of the reasonable interpretations that can be given. So that's at least a minimum as to what the court was saying. And why isn't that true, regardless of what level of deference? Well, I think it depends a little bit on the facts. Going to the under-federal jurisdiction issue, in that case, you had actual ownership of land, treaties, and actual jurisdictional acts that gave rise to the notion that there was federal jurisdiction. There's none of that here. There is an Indian agent talking to some Indians in Amador County about maybe getting them some land, and that's it. And so to conclude that that rises to the level of jurisdiction, as the agency has here, just really nullifies the concept. So it wasn't the point to distinguish between those tribes, and there were some, that were strictly under state jurisdiction in some areas, versus all the other Indians in the United States who were under federal jurisdiction. Wasn't it just simply that minimal division that was intending? Well, yeah, I think that's the argument that we've made, and the ion ban was always under state jurisdiction. Well, but it wasn't, I mean, I guess that's the question for decision. Right. It's whether the fact that they were talking with the Indian agent is jurisdiction. And I think that to conclude that that is. Well, it isn't per se, but it may be evidence of jurisdiction. But it's the only evidence of jurisdiction, really. The ROD rests its conclusion that there was jurisdiction exclusively on that. That is the only evidence that it relies on. It notes some other interactions, but that is the basis of the ROD's conclusion that there was federal jurisdiction in 1934, and the agency is limited to the basis on which it decided. Why wouldn't your definition of jurisdiction make jurisdiction and recognition essentially the same, such that one or the other would be superfluous? Well. How is there a difference in your understanding of the two terms that would leave some space between them so they're both meaningful? Well, I mean, I think that a tribe could have been recognized by the federal government at one point and no longer be under federal jurisdiction because they had interactions, and then over time there were no longer any interactions. And so they could have been recognized but not under federal jurisdiction at that point. So you view that under federal jurisdiction as not being the status but being an activity, if I understand what you're saying now. Because when you said they could be recognized but not do anything more, I don't understand how that makes any difference. Well, I think federal jurisdiction requires that, yeah, I suppose it is fair to say it's an activity. It requires that the federal government be exercising authority over the tribe, and not in the sense that they exercise the authority over everyone who lives here. I mean, they exercise authority over me and you and everyone, but that they specifically be acting with respect to that tribe in a way that they are, in the classic formulation, a ward and guardian. And why is getting land for them not an example of that? Well, had they gotten the land for them, that would have been an example. Trying to is a bit, what's the difference? Well, I think at best that suggests that they proposed to take them under federal jurisdiction, but that's not the same thing as having actually done so. They never reached anything more than just discussions. And I think if that constitutes jurisdiction, then anything does. I mean, all we're talking about is conversations. And really, when you get down to it, they talked about getting them some land. They took some early steps to try and do it, and then they gave up. And so if jurisdiction was to have any meaning at all and to be a meaningful limitation on the Secretary's power, which it clearly was meant to be based on the legislative history that we've discussed, then it needs to mean something more than just having some discussions with some Indians who are living in Amador County. You've exceeded your time, but we asked a lot of questions, so you can have a couple of minutes for rebuttal. Thank you so much for honoring the point. We'll hear from Mr. Speltzer. Thank you for honoring it. Let me start with the APRA. This is a different case, so if you could do the introduction for the record. For the record, this is John Speltzer for the Department of the Interior. Let me start with the APRA questions. I want to get to the regulatory question, but let me start with the context and talk a little bit about the statute. What we're talking about is the prohibition on gaming on after-acquired land. And what Congress did is when they passed IGRA in 1988, they wanted to be sure they didn't set out on a land rush where Indian tribes would go and try to buy land in lucrative areas for gaming. And so that was the reason to have this prohibition in the first place. But at the same time, they had that prohibition on gaming on after-acquired lands. They provided for these exceptions, and the purpose for the exceptions was to deal with the circumstance where there were tribes that their status was in dispute, and they didn't have lands at the time. And the point was to provide a mechanism to put those tribes on a relatively even playing field with the tribes already established. So the point is to give those tribes that opportunity. With respect to that statutory purpose, the IOM ban fits. They did not have land in 1988, and they did not have land in 1988 because of this recognition dispute. So they fit that purpose of the statute. But that doesn't even really matter, right? The question is whether the regulation is valid on its face, and if it isn't, then they clearly fall under it, right? Yes, absolutely. It's relevant because it goes to what the nature of the regulation is. And I raise the point because Amador County's attorney does not argue that on the statute itself, right, that they violated the terms of the statute for they restored lands exception. They just rely on the regulation and say, well, the regulation said Congress met this, so therefore the regulation can't be applied. But Your Honor's point is correct. It's the regulation and how that regulation interfaces with the statute. And our point is what Interior did in 2008, 20 years after the statute was enacted, was to try to narrow the focus of some of the statutory terms and to provide more order, regulatory order, for how things were to go forward in the future. But at the time Interior did that, Interior didn't say that any past Interior land decision that we made interpreting the statute is contrary to the terms of the statute, right? They just said, well, this is what we think is the better view, and this is what we're going to use going forward. And so, again, so they don't claim a violation of the statute. They don't claim a violation of the regulation, which on its face says that there is a prior Interior lands decision that these new regulations shall not apply. But what they do say is that because of this NRDC case, there needed to be some sort of application of these NRDC factors, and somehow it works out to being arbitrary under NRDC. What we say is NRDC doesn't apply because NRDC was a case where the court took factors that this court and other courts have used to determine the limits of when an administrative agency may impose something retroactively to come up with a standard for the interpretation of the Clean Air Act, where it was determined that EPA there must, in certain circumstances, impose the regulations retroactively. And that was in that unique circumstance of a statute that required a regulation to be enacted and where the congressional intent of retroactivity to solve pollution problems was clear. And so what the Supreme Court, I'm sorry, what the D.C. Circuit said in those cases, well, if you can't show that there's reliance and a departure from law and a burden, EPA, you can't just justify grandfathering on those grounds because that would be violations of what Congress intended. Here you don't have a requirement that the agency even have a regulation. And then, of course, then it's up to the agency when they adopt the regulation as to how that regulation will apply. So I don't see how you can find a statutory duty to apply something retroactively where there's not even a duty to have a regulation. But let me go one step further and respond to the issues about the NRDC factors. I think if the court determines that those are relevant factors, just looking into whether this application of the regulation was arbitrary, that those factors have to be looked at in the proper context. The first factor being reliance. One thing the court should understand is these interior land decisions that were first being issued by NIGC and then under a memorandum of understanding by the Department of Interior Solicitor's Office in the context of land and distress determinations were designed specifically to provide tribes with assurance about how the law was going to apply. And when these opinions are issued, they are issued on the understanding that the tribes are going to rely on them. That's the whole point of it. It's a preliminary step to put out there so the tribes are able to get financing or whatever they need to move forward with their projects. And that certainly is relevant to considering whether it's reasonable to grandfather in that circumstance. The second NRDC factor is this question, was there a departure from or an abrupt departure from the preexisting law? Now, with respect to the statute, if you just look at the regulation, the new regulation in the statute, you could say, well, the regulation is just filling a void. But if you look at the new regulation with respect to the 2006 solicitor's opinion, then there certainly is an abrupt departure, right? You have in 2006 the solicitor interpreting the very same statute and saying, yes, for the reasons I had said before, that, you know, this is a tribe that was landless and the recognition was restored. They fit in broad terms in terms of the statute. So you have a reasonable interpretation of the statute in 2006. Two years later, a completely different interpretation, right? That's an abrupt departure. The third factor under NRDC is this question of whether there's substantial burden. Amador County argues, well, there's not much of a burden because there's another course to getting land eligible for gaming through this other process. But the other process, of course, is a lot more burdensome and is subject to a gubernatorial veto, which could obviously be, in certain circumstances, an insuperable burden. So there certainly is a much greater burden in that context. And then the last factor is, well, what is the statutory factors in favor of retroactivity? And, again, as we said, they're not even required to have this rule, right? And so the agency was adopting this rule for practices going forward. But I'm reasonably determined in this context that if there was a decision out there and on the faces, you know, applying the regulation on its face, that the URIC rules would not apply to this particular decision. And we think that was perfectly reasonable. Can I ask you a question back on IRA? If we need to decide to decide this case, what recognition means under IRA? No. Why not? Because there are a number of potential definitions as to what it means, but there's no dispute as to the fact that they were a recognized tribe at the point that land was taken into trust for the D.C. Circuit's determination and the Department of Interior's reading of the statute. What matters is recognition at the timeline is taken into trust. And if the timeline was taken into trust, it was the most, the highest form of what recognition could mean. It was cognitive, official, and political. But wouldn't they argue that you needed to do the Part 83 process to get recognition that you haven't? So isn't there some definition of recognition that wouldn't be met? And that was an argument. It was made, I believe, by the No Casino groups. I'm not sure that was an argument made. Okay, fair enough. But the statute was patented in 1934. What the No Casino groups are saying is that somehow when Congress said recognize in 1934, they anticipated the regulation. Well, so I'm not worried about the date. I'm not asking do we have to, I mean, that's another issue. I'm just asking once we get past presumably the 1934 question, do we have to decide what recognition means? And maybe your answer is we don't need it for this case but the other case. But I'd like to know if you think for either case we need to do that. With respect to the Part 83 point, I think that was a procedural argument that said administrative recognition can come only through a certain set of procedures when a statute left it to the agency's discretion as to, in fact, the statute doesn't even talk about when recognition has to happen. It just says there needs to be a recognition. Obviously, there needs to be a recognition at the point of acting under the statute. But that procedural argument as to who has to recognize is different from the question of what does recognize mean. And I think what the arguments before have shown is there's sort of a range between cognitive recognition, which would deal with the way the statute uses the phrase in the past tense, is recognized, which would allow a circumstance where if, you know, people who were within had the means to know, had full knowledge, it's sort of an objective test, you know, were they recognized by neighbors and others as being an Indian tribe. It doesn't necessarily require official recognition by agents of the United States. And so then there's official recognition by agents of the United States. And then there's a political recognition, which means not only do the agents of the United States recognize the tribe, but understand the political relationship between the tribe and the United States. What we're saying is it's not an issue in this case because, well, if the court agrees with the D.C. Circuit's interpretation and the jury's interpretation, that what matters is that that decision is made at the point the tribe is or the land is taken into trust. The tribe is listed under federal law. They have that, you know, cognitive, political, official recognition. If the court were to determine that now modifies recognized, what we had said in our briefing is that's not a position that the department took in the record of decision in this case. And in that context, it would be fair to remand the department to make this. So the department can decide whether it's cognitive recognition versus official as to what the statute meant, because the department, we submit, is of no deference in interpreting this. And so the last point I would make with respect to Chevron deference, it's my understanding that Chevron deference is accorded when an agency interprets a statute in a circumstance where they take a determination that has force of law and that, you know, when you're taking a land into trust and giving it a certain status, that has force of law. And the D.C. Circuit provided Chevron deference there, and I don't think there's any issue about Chevron deference being applicable. Thank you, counsel. We'll hear from Mr. Obey. Thank you. May it please the court, I'm Jerome Obey. I'm appearing on behalf of the iron band. Can you hear me all right? Yes. Just a couple of points to follow up on. First of all, it is important to place this case in context, and the context is a record comprised of over 20,000 documents that the department had in front of it continually throughout this evaluation. Secondly, the department itself is charged with a very special kind of responsibility towards tribes in this country. And tribes, as you know or not, are unique governmental entities in the United States, unlike anything else. And so the expertise that the department has really is very special here and very particularized. And in those 20,000 pages are ethnographic studies and maps and gesturing, including lots of correspondence between the tribe and various agents. And what that correspondence shows and what's reflected in the district court's opinion, which clearly went back and verified that the BIA had considered the record. In fact, I think there's a pretty meticulous job that was done at both levels to support these decisions, was that even as early as the year after California became a state, the tribe was already recognized. In other words, it has been recognized in some form or another longer than California, and that's because of Treaty J. Even though Treaty J was not actually consummated, either were hundreds of other treaties with tribes. The history in this country is well known in terms of the broken promises that were made to tribes. Treaty J was no different than that. Treaty J was an attempt to satisfy the loss of lands that the tribe had experienced and to provide it with resources, including teachers and the ability to build schoolhouses and to restore their economy, which had been destroyed with farming tools and livestock and things like that. And in the third paragraph of Treaty J, just for interest purposes, there is a recitation that the tribe acknowledges that it is under the jurisdiction of the United States. Now, that's key probably for any treaty. And so to be arguing now, what is this, I don't know, 50, 175 years later, about this safe issue is just another indication of what this tribe has had to endure, even though it has been there, it's done everything it had to do, and it was even told that it didn't have to do any more at one point in the record. You can see letters of at least a hundred from the assistant secretaries that there's nothing more that they have to do. They've done everything. That's why the regulations that were promulgated on recognition became irrelevant because by the time those regulations were in place, this tribe had been recognized by the United States, not only by its actions in Treaty J, but in 1915 with extensive efforts to buy land for it, including preparing a deed and circulating a deed that recited that this land was for the Iowan Band of Indians and manifesting that recognition every way you can imagine. As far as what recognition means, from a legal standpoint, it certainly means that there's an acknowledgment that the tribe has some status as a tribe of American Indians, that's got some kind of organization, has been identified as such, and has been treated by such, and will be treated as such. It is distinguished from just a group of people who may want to call themselves a tribe, and so that was one of the things, if you look at the Senate reports on IHRA, that there was some concern about by some of the Senators. There's also some hostility, as we all know, and the record reflects that hostility even inside the agency to the existence of tribes. That's one of the explanations for why there may have been different decisions, but ultimately we had essentially the Commissioner, the Assistant Secretary, Deere, who comes in and says, look, this is really ridiculous. These guys have got a functioning tribe. They've been recognized tribe by us. We've told them we've extended all the tools that we have at their disposal, and they need to be placed on the official records of the United States as a recognized tribe. That has never been challenged. Thank you, Counselor. Thank you. You've used your time, and I believe there's some rebuttal time coming to you. Two minutes, two minutes left. Thank you, Your Honor. I'll be brief, and I just have a few points. One point I want to make is I don't know that I fully addressed Your Honor's question before about whether we were challenging the grandfathering and the regulation broadly or just in this case, and we talked about sort of the broad application of it, but in this case the other point that's worth noting is that the Indian lands opinion in this paper I don't know was withdrawn for three years. And so really we're talking about a decision in 2012 by the solicitor who was in office at that time that this was sort of stolen tribe. It isn't really a reliance on the 2006 one. The agency withdrew that decision. And so to sort of pretend that that didn't happen and, oh, act as if it's always been in effect, I think is really a corny fact. But the regulation, as you're objecting, doesn't say that the tribe has to show reliance, right? It just says that if you already had the recognition, you need it. Right. But then the regulations themselves say, but we can always withdraw it. We always retain the power to wipe out. But the agency hasn't, though, right? But they did. But not at the relevant time. I mean, by the time they ñ by the relevant time later they gave recognition back and then that was ineffective for the grandfathering clause. But I think this, again, goes back to the issue of reliance. I mean, that Indian lands opinion was not in effect for the bulk of the time between the time it was adopted in 2006 and the time that this Indian ñ that the lands trust decision was actually made. So to say that ñ But so this gets to your point that your view is the regulation is invalid on its face because it doesn't require actual showing of reliance by the particular tribe seeking recognition under the grandfathering clause. Right. Yes. But I also think to treat this as being reliance on the 2006 decision is really not true because that went away as really an independent act in 2012, and that doesn't fall within the terms of the regulations. But we only get to that question if we're looking for individualized reliance, right? Well, no, I don't think so because they took an act in 2012 and under the terms of the regulations themselves it has to have been a ñ Indian lands had been in effect prior to the date of the regulations in 2008. So in other words, to pretend that this is all premised on the 2006 Indian lands determination, that went away. This was an independent act by the solicitor's office in 2012 when they adopted the ROD to say, yeah, this is a restored tribe based on all of these facts. So I think that factually also distinguishes ñ I think the regulation is a problem, but I also think they don't come within the terms of the regulation. Thank you, Council. We appreciate the arguments of all of you in this very challenging case. It is submitted, and we will take a recess for about ten minutes.
judges: Graber, Friedland, Fogel